## THE MAURICE R. SHAW.

### MAINE SEABOARD PAPER CO. v. THE MAURICE R. SHAW et al.

### SHAW v. MAINE SEABOARD PAPER CO.

Nos. 526, 529.

District Court, D. Maine, N. D.

Sept. 24, 1942.

Cook, Hutchinson, Pierce & Connell, of Portland, Me. (Leonard A. Pierce and Nathan W. Thompson, both of Portland, Me., of counsel), for Maine Seaboard Paper Co.

Verrill, Hale, Dana & Walker, of Portland, Me. (Robert Hale, of Portland, Me., and Thomas F. Mount (of Rawle & Henderson), of Philadelphia, Pa., of counsel), for Larnie B. Shaw and another.

PETERS, District Judge.

The Maine Seaboard Paper Company in its libel in rem charges that the tug-boat which it chartered from Shaw, the owner and claimant here, was in such bad condition as to its engine equipment,—contrary to warranties in the charter,—that she broke down on a voyage, causing the Paper Company damage in loss of use of the boat and expense for repairs, which it seeks to recover.

The cross-libel in personam by Shaw alleges that the boat when chartered was in the good condition she was agreed to be in and that the break-down and expense of repairs and a subsequent disaster in the breaking of the crank-shaft were caused by the negligence of the Paper Company,—a breach of the charter for which he wants damages.

From the evidence I find the following facts:

The Paper Company chartered the tug to tow barges loaded with pulpwood from Eastern Maine and Canadian ports to Bucksport, the location of its mills, during the season of 1939. The tug-boat was delivered to the Paper Company's captain at Philadelphia on April 22nd, 1939, a "bareboat charter" having been signed April 8th of that year. The owners of the tug stipulated that the chief engineer should be a man named by them, being, as they said, competent and familiar with the engine, and he was employed by the charterer and remained with the boat throughout, except during a short illness. With Captain Hicks in charge the boat proceeded from Phila-

768

delphia to Rockland, Maine, where it picked up the barge "Helvetia", owned by the Company, and continued to New Brunswick for a load of wood to be carried to Bucksport.

Captain Hicks made five trips from the Bay of Fundy to Bucksport with the tug and loaded barge, apparently without incident, when on the sixth trip the trouble began which resulted in this litigation.

On May 27th the tow left Magaguadavic River for Bucksport in rather bad weather but reached Quoddy Roads the next forenoon and anchored. Towards night, the strong wind having lessened somewhat and the tide being favorable, the captain decided to continue the voyage and, although there was a heavy sea and dense fog, raised the anchor and laid his course for the whistling buoy off Little River. About 9 p. m., in the vicinity of the buoy, about two hours from East Quoddy, the engineer reported to the captain that the engine was getting water in the lubricating system; that the engine was not being injured, but that it would not be prudent to stop to listen for the buoy, as usual, because it might not be possible to start the engine again. At somewhat reduced speed a point in the vicinity of Libby Island was reached, the tide being then ahead, the sea heavy and the fog still dense. At 11:30 p. m. the engineer reported the engine trouble getting worse and suggested going into Machias Bay. The captain decided that was not feasible and, as there was too much water to anchor, and as the engine was still operating and the engineer said the engine was not being injured, the captain decided to try to work more off-shore, out of the tide and in more sea-room. This was accomplished when at about five a. m. May 29th the bearings commenced to burn and the engine was necessarily shut off. The fog clearing up in a few hours the captain sent a dory ashore to Cranberry Isle Life-Saving Station for help, which came in the form of another tug, by which later the disabled tug was taken to Bucksport and thence to the Boyce Machine Shop in Portland where it was found that parts of the engine were worn out and replacements and repairs badly needed. The extent and nature of the defects in the power equipment which were disclosed when the engine was dismantled are in dispute, but there is no doubt that the cylinders were so worn that they had to be replaced with new ones and the main bearings which held the shaft had worn to the extent of requiring re-boring of the engine base and

new bearings to be installed. These and other repairs and replacements were made by the Boyce Machine people, with the consent of the Shaws. The cost was around $14,000, paid for by the Paper Company, which received $4,500 from the insurance carried for the benefit of both parties.

The work at the machine shop took considerable time (from June 8 to July 21) due largely to the difficulty in getting the repaired engine to run without heating up, but finally, after installing what seems to be a double oiling apparatus, the engine was called fit to run and the tug went into service again and ran until November 21, when, the boat being at the dock in Bucksport with the engine idling preparatory to starting on a trip, the crankshaft broke. This ended the usefulness of the tug for that season. The Paper Company notified the Shaws to come and take her, which they did.

Both parties agree that the crankshaft broke as the result of what is called "crystallization" caused by what is referred to as "fatigue" in the metal of which the shaft was made. They also agree that the fatigue was caused by the fact that the engine was not in proper alignment, which imposed an undue strain on the crankshaft, but the parties violently disagree on the point as to who is responsible for the misalignment,—the owner of the boat laying it to improper work by the Boyce Company and the charterer to the worn-out condition of the engine at the beginning of the charter.

From the view I take of the case, however, it is not necessary to pass on this point of fact in dispute, which may be fortunate, because it seems to me wholly a matter of guesswork as to when the misalignment originated, whether when the engine was set up by the makers, or during the years the Shaws used it, or when Boyce got through repairing it.

It is claimed by the owner that Captain Hicks should not have run the engine the night of May 28th and 29th, in its then condition; that doing so all night caused the break-down, which necessitated the repair work of Boyce which produced the misalignment which caused the eventual breaking of the shaft. This theory rests on original negligence of the Paper Company in operating the boat. As to whether the captain should have run the engine depends upon whether he should have put to sea when he did, because when he was informed that a supposedly sound engine was

going wrong he was in a position where it seems he either had to keep going or incur too great danger of going ashore.

I feel that I should accept the judgment of the captain, both as to the expediency of putting out and as to proceeding after Little River. The captain was a native of that locality and an experienced navigator of those waters. The weather was bad, to be sure, but this was all-weather work which the tug was hired for. If the captain had always waited for the fog to clear up in the Bay of Fundy there would have been little wood carried to Bucksport.

The Court will seldom question the judgment of a shipmaster in making his decisions as to the proper handling of his vessel. The cases on that point are numerous. Counsel furnish the following: The Lusitania, D.C., 251 F. 715; The Smith Terry, No. 1, D.C, 34 F.2d 570; Lawrence v. Minturn, 17 How. 100, 15 L. Ed. 58; Columbian Ins. Co. v. Ashby et al., 38 U.S. 331, 13 Pet. 331, 10 L.Ed. 186; The Guadeloupe, D.C, 92 F. 670.

Moreover, the claim on this point is well met and at the same time the judgment of the captain vindicated by the fact that nothing happened to the tow, the engine or the crew on that night that was in any way caused by the weather. The failure of the engine (the only unusual thing that occurred) was not due to rough weather or fog. The salt water that got in the oiling system did not come over the side, but came from the water jacket enveloping the cylinders to cool them, through a cracked cylinder head or some other defect in the engine. The cooling system drew salt water from the sea in fair weather or foul. There is no evidence that the engine was injured by rough water. It is true that if the weather had been clear the captain might have made a harbor, but he had a right to expect that the engine would operate as a sound engine should, and if it had, there would have been no trouble. I can find no fault on the part of the Paper Company upon which a claim for damages may be predicated.

It is urged in behalf of the owner of the tug that even if the charterer was not guilty of negligence on the night of May 28th–29th, the charterer is still liable under the terms of the charter party for failure to return the tug in as good order and condition as when delivered, reasonable wear and tear excepted. This brings up the central question in the case,—being the condition of the tug when delivered,—which affects the liability of both parties. The contract between them provided that the tug upon delivery should be "* * * tight, staunch, strong and in every respect seaworthy and in good running order, condition and repair both as to hull, machinery and equipment, so far as due diligence can make her."

That was the obligation of the owner. The charterer undertook to "* * * keep the said tug in the same condition as fully tackled, apparelled, furnished and equipped as at the time of delivery, except said charterer shall not be responsible for reasonable wear and tear in said tug, her machinery or equipment nor shall the charterer be responsible for any repairs or damage caused or contributed to by any latent defect, or wear and tear in the hull, machinery or equipment."

It would seem quite clear that even if the owner had kept the obligation above mentioned, the charterer would not be liable on the facts, because the worn and defective condition of the engine which was obvious when taken down,—even if not known to or easily ascertainable by the owner,—would certainly be classed among the things the charterer was not responsible for; but it is difficult to escape the conclusion that the engine in the tug, when delivered, was not in that good condition and repair which due diligence could make it.

When the engine was taken apart in the Boyce yard it was found to be in bad condition and not fit to run without making extensive and expensive repairs and replacements. The only damage done the night of May 28th, according to the experienced engineer furnished the boat by the owner and called by him as a witness, was burning out one connecting rod bearing and the consequent scoring. The condition of the engine on April 22nd must have been the same as when opened up at the Boyce yard, minus the connecting rod damage and minus the effect of ordinary wear and tear for about a month. The difference leaves an engine far from "strong" and "in good running order, condition and repair". It ran for a short time without a break-down, when it apparently reached the limit of its endurance.

I think the owner in his contract assumed responsibility for the weak and unsound condition the engine was found to be in. No doubt he thought it would run for the length of time required, but he was mistaken in his judgment.

The limitation in the warranty of good condition,—to the extent that due diligence could produce it,—does not much change the effect, especially in the light of the facts here present. It had taken several years of an improper condition of repair to bring about the more serious defects found. The Shaws had owned and run the engine for twelve years. The engine complained of its own condition when the boat was taken out in April. The expert marine engineer called by the owner testified that the piston-slap then heard was a clear indication that something was wrong.

I find a breach of warranty as to the condition of the engine from which the charterer sustained damage. The charterer also paid for repairs for which it can recover, as they were not necessitated by its fault.

The libellant in rem is entitled to judgment,—the amount to be subsequently determined.

The cross-libel is to be dismissed with costs.

Decrees will be entered accordingly.