STAR FISH & OYSTER COMPANY, Inc., a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 2633.

United States District Court
S. D. Alabama, S. D.

Nov. 7, 1963.

Thomas M. Galloway, Collins, Galloway & Murphy, Herndon H. Wilson, Mobile, Ala., for plaintiff.

Vernol R. Jansen, Jr., U. S. Atty., Mobile, Ala., Hubert M. Doster, Atty., Tax Division, Dept. of Justice, Washington, D. C., for defendant.

DANIEL HOLCOMBE THOMAS, District Judge.

This is an action instituted under the provisions of 28 U.S.C. § 1346(a) (1) by the plaintiff to recover taxes paid under the Federal Insurance Contributions Act (26 U.S.C. § 3101 et seq.), and under the Federal Unemployment Tax Act (26 U.S. C. § 3301 et seq.), which taxes are alleged

to have been erroneously paid by, and unlawfully collected from, the plaintiff for the calendar year 1956, with respect to the earnings of the captains and crew members of commercial fishing vessels owned by the plaintiff.

The sole issue is whether or not the captains and crew members of the vessels here involved were "employees" of the plaintiff within the meaning of sections 3301 through 3306, and section 3121, Title 26 United States Code, and the applicable regulations issued thereunder. (Treasury Regulations, Internal Revenue Service, 26 C.F.R. 31.3121(d)–1 (c), and 31.3306(i)–1.)

## FINDINGS OF FACT

1. The plaintiff, a corporation duly incorporated and existing under the laws of the State of Alabama, owned a number of commercial fishing vessels that operated out of Mobile, Alabama, during the year 1956. During said period, the plaintiff was engaged in the wholesale seafood business. The activities of the plaintiff's business included (1) fishing for marketable seafood, (2) ownership and maintenance of fishing vessels, (3) ownership and operation of boat docks, (4) the manufacture and sale of ice, (5) the purchase of seafood from boats other than those owned by the plaintiff, (6) processing seafood, (7) packing seafood, and (8) selling the processed and packed seafood at wholesale.

2. In connection with its business activities, the plaintiff owned ten boats during the period in question. These vessels are diesel-powered, two-masted schooners especially equipped for fishing operations. Some of these boats are more than twenty-five years old and have been depreciated considerably. However, the replacement value of one of these vessels is between $40,000 and $50,000. Each of these vessels was operated on what is known as the "lay" basis, in accordance with a long-standing custom in the fishing industry in this area. Under this system, settlement is made between the owner and the captain after each fishing trip. The amount of settlement is ascertained by unloading and weighing the catch and converting its weight into dollars-and-cents based on the prevailing market price. From this amount is first subtracted the cost of the bait; then the expenses of the trip are deducted, i. e., cost of groceries, fuel, ice, etc. Next, the boat's percentage of 25% is taken out; and after the boat's percentage is deducted, then the captain's of 13% is also subtracted, and the remaining 62% belongs to the crew.

3. The plaintiff generally hires or "makes a captain" from personnel already shipping out on its vessels. After the selection is made, the prospective captain is informed of the plaintiff's intentions and advised of the lay-basis sharing arrangement. If the captain agrees, then he is "given" one of the plaintiff's boats. The arrangement between the plaintiff and the captain is entirely oral. The term of the arrangement is not limited, nor is it specified. While not formalized by the parties and designated as such, the arrangement constitutes an oral contract in accord with which the captains utilize the plaintiff's vessels on terms and under conditions outlined in these findings of fact. After the plaintiff has selected an individual to be a captain and the arrangement between plaintiff and the captain has been concluded, the boat is turned over to the new captain, who then registers as captain of such vessel with the Bureau of Customs, as required by federal law.

4. Each captain determined the qualifications of and selected his own crew. The captain also determined the hours and working conditions of the crew, and how much and when the crew was to be paid. Each captain also had full charge of his crew and determined (1) when to ship out for a fishing trip, (2) when to return, (3) where to fish, (4) when to fish, (5) how to fish (i. e., the actual mechanical operation of the fishing gear); and (6) any other matters concerning the operation, maintenance, discipline of the crew, and fishing of the boat from the time the vessel left the plaintiff's dock until it returned. The members of the

crew took their orders from the captain exclusively.

■ 5. The above-enumerated prerogatives of the captain were for his decision exclusively. However, operational and economic exigencies would require their occasional modification from time to time. It is common knowledge that factors such as weather, market stability, icing conditions, vessel spacing, mechanical difficulties, crew illnesses and accidents, all play a major part in the success or failure of a particular fishing trip. The captain would therefore keep his plan of operation and fishing schedule flexible enough so as to be able to utilize information concerning the foregoing factors whenever it was made available to him over the ship-to-shore radio. Testimony bears out the fact that occasionally the plaintiff would request certain changes of operations by the captain, due to vessel spacing, market conditions, etc. The foregoing factors have necessarily been taken into account by seamen since time immemorial. The plaintiff, with a vested interest in each voyage, would have been remiss if it had failed to pass on any germane information and had neglected to make certain requests of the captains with respect to changed operating conditions due to unforeseen events. There is no evidence that any captain was released from his arrangement with the plaintiff for failure to follow any shore-to-ship requests made to the captain by the plaintiff.

6. The plaintiff had no right to and did not instruct the captains or the crews as to the methods or techniques employed in their work, or how to accomplish it. The plaintiff had no direct relationship with the crew. The captain selected them, worked them, paid them, and "fired" them, if necessary. The plaintiff did not know who the crew would be at the time the arrangement was made with the captain; and in fact, the crew changed frequently from trip to trip.

7. The plaintiff requested that the captains refrain from going into other ports to sell their catch there. However, if the captain wished to go into another port in order to sell his catch, he could do so. It was generally the custom for the captain to call in to the plaintiff's office prior to entering a strange port. It was not imperative that the captain make such a call, but among captains operating another's boat on the "lay" basis in this general area, it is considered the proper and cooperative thing to do. Such a report enabled the plaintiff to arrange maintenance, credit, and transportation for the vessel and crew in the event that it was required. It also allowed the plaintiff an opportunity to purchase at the strange port the catch itself, and have it shipped back to Mobile or processed there.

8. On occasion, the plaintiff would make an advance to a captain with the understanding that it was a loan. Such loans were repaid out of the captain's share from future catches. Advances to the crew were sometimes made by the plaintiff with permission of a boat-captain, who was personally charged with its repayment. The captain would then charge this amount against the crew member's share, which share had already been agreed upon separately between the captain and his crew.

9. Each captain and crew member furnished his own personal equipment, e. g., oilskins, boots, mattresses and bedrolls, which were bought locally by the crew, charged against the boat, and paid for by the plaintiff, who in turn charged it to the captain. It was then up to the captain to deduct the cost of the equipment from the individual crew member's share of the proceeds of the catch.

10. The captain determined how much fuel, groceries, and ice to take aboard. The captain had a right to purchase his groceries at a store of his own selection; but usually these supplies were purchased from one of several stores where the plaintiff had an established line of credit. Vegetables are purchased from the local farmers' market by the cook and captain. The captain would usually charge supplies to himself and crew in the name of the boat, and the bill therefor would be sent to the plaintiff. When settlement

was made between the captain and the plaintiff after the voyage, this amount charged against the boat was deducted from the amount that the catch represented. The plaintiff ordered the meats, and generally ordered all of the dry stores at the direction of the captain.

11. Each trip is considered a separate transaction for purposes of settlement. The payment to the crew for each trip depended entirely upon the proceeds of the catch. The length of any particular voyage depended upon various factors such as the fuel and ice supply, the capacity of the boat, the food and water supply, the weather, and the general fishing conditions. Generally, each trip would last approximately eighteen to twenty-one days.

12. There was no guarantee of any kind of compensation to the captain or crew, regardless of the time, money or effort expended in attempting to catch fish. They were paid only for the fish caught. If a particular trip was unsuccessful, known in the fishing trade along the Gulf Coast as a "broker,"[1] then the captain and the crew would receive no compensation for their efforts except a token amount of $100 to the captain and $25 to each crew member. The custom of paying "broker money" for unsuccessful trips has long been established in the fishing industry, and only the amounts paid by the divers boat owners are subject to vary. It was not mandatory, nor was there any agreement or arrangement whereby the plaintiff was obligated to pay "broker money" to the captains and crews. The plaintiff also had established a custom of giving a Christmas and an Easter gift to the captains and crew members. Generally, the captains were given $50 at Christmas and at Easter, and the crews were given $5 at Christmas.

13. There was no express agreement which specified the extent to which plaintiff had control over the fishing activities of the captain. There were certain agreed-upon safety regulations, mostly of a general nature which pertained to the use of alcoholic beverages on board the plaintiff's boats. These regulations were verbally communicated to the captain and crews, and were strictly enforced. The plaintiff also instructed the captains, in writing, to observe the territorial waters of Mexico. Aside from these admonitions, the captains were free to operate their boats in whatever manner they wished in order to achieve the desired results. It is clear that in fact the plaintiff exercised no actual control over the details, manner or methods employed by the captain and his crew.

14. When a captain brought his boat back to the plaintiff's dock after a trip, it was "understood" that the entire catch would be unloaded and disposed of by the plaintiff. While the plaintiff did not pay any captain or crew member a salary, and did not guarantee any captain a profit from his fishing, the plaintiff did guarantee each captain a market for his catch at the prevailing market price when brought to Mobile, Alabama. Each captain was thus assured that his catch would not be lost by spoilage.

15. The livelihood of a captain depended solely upon his individual skill and initiative as fisherman, subject of course to the perennial viscissitudes of the weather and of the fish themselves. As in non-commercial or pleasure fishing, a fisherman might have to toil long periods of time without any measure of success, while on other occassions, Poseidon (Neptune) may handsomely reward him with a large catch made in a relatively short space of time.

16. The plaintiff maintains $1,000 deductible vessel insurance on each boat, which covers damage to the boats; but no personal liability covering any of the captains or crews is provided by the plaintiff, although in times past the plaintiff has carried some personal liability insurance on the crews.

---

1. A trip is termed a "broker" when a boat is unable to catch enough fish to pay for the expenses of that particular trip.

**406**

17. The plaintiff paid the entire operating cost, maintenance and upkeep of each vessel. The individual captain, together with the boat (plaintiff), and crew, paid the operating costs of each particular trip, e. g., groceries, ice, fuel, etc., from the proceeds of the catch before division. The plaintiff did have the right to control the *results* of the captain's work, and did interfere in the operation to some degree consistent with an attempt to assure a propitious result from the undertaking. The plaintiff had no actual control over the crew members nor did it exercise any control over their activities through the captain, except as outlined in Finding No. 13 above. The court finds no substantial evidence of any effort on behalf of the plaintiff to control the captain or crew members to such an extent as to justify a finding that such personnel were "employees" rather than independent contractors. Nor does the court find that the plaintiff possessed any right to control the activities of the captain and crewmen except as outlined in Finding No. 13, and in accord with sound procedures based upon safety requirements and ancient custom prevailing in the fishing industry at that time.

18. The plaintiff usually would have no written record of the identity of the crew members of the vessels until the time of actual settlement. But, as a practical matter, all of the captains and most of the crews were known to the plaintiff. At the time of settlement, the plaintiff required the identities of the crew members for the purpose of listing them on the corporation's records for State Unemployment Insurance, Workmen's Compensation, and Federal Withholding and Social Security Tax reports as required by the State of Alabama and the Internal Revenue Service.

19. The plaintiff filed employment tax returns with the Internal Revenue Service during the period here in question (calendar year 1956), and paid employment taxes on the earnings of the captains and crew members for that period. The plaintiff filed the required quarterly returns and made the required quarterly payments with respect to the Federal Insurance Contributions Act taxes on April 19, 1956, July 16, 1956, October 22, 1956, and January 31, 1957. The plaintiff filed the annual return and paid the annual tax with respect to the Federal Unemployment Tax Act on January 31, 1957.

20. The plaintiff filed a claim on January 29, 1960, for refund of its portion of the Federal Insurance Contribution Act taxes and the Unemployment Act taxes paid on earnings of the captains and crew members.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and of this action pursuant to the provisions of 28 U.S.C. § 1346(a) (1).

2. The plaintiff's claim with respect to Federal Insurance Contribution Act taxes was timely filed as to the last quarter of the calendar year 1956; but such claim as to the first three quarters of 1956 is barred by the provisions of 26 U.S.C. § 6511.

3. The plaintiff's claim with respect to the Federal Unemployment Act taxes was timely filed as to the entire amount.

4. The captains and members of the crews of the plaintiff's fishing vessels during the calendar year 1956 were not "employees" of the plaintiff within the scope and meaning of Title 26 U.S.C. §§ 3121(d) and 3306(i), Internal Revenue Code 1954, and Regulations 31.3121(d)-1 (c), and 31.3306(i)-1, 26 C.F.R.

5. The plaintiff is entitled to a refund of Federal Insurance Contributions taxes and Federal Unemployment taxes claimed by reason of the erroneous payment and collection thereof in an amount to be computed by the defendant, consistent with these findings and conclusions of law, together with interest and costs as provided by law.

6. Judgment will be entered for the plaintiff in this cause.