August SOLET, Plaintiff,

v.

M/V CAPT. H. V. DUFRENE, its engines, boilers, furniture, gear, tackle and apparel, etc., in rem, and Elvin J. Dufrene, in personam, Defendants.

Civ. A. No. 67-1713.

United States District Court
E. D. Louisiana,
New Orleans Division.

Aug. 19, 1969.

---

Harvey J. Lewis, New Orleans, La., for plaintiff.

William A. Porteous III, New Orleans, La., for defendants.

RUBIN, District Judge:

On the morning of April 13, 1966 the M/V CAPT. H.V. DUFRENE and her crew were shrimping in the Gulf of Mexico approximately two miles off the Louisiana coast. August Solet, a deckhand aboard the trawler, was using a winch to lift a net containing a haul of shrimp. The winch cable ran through a block suspended from a shackle. The shackle was fastened to a pad eye, or "U" bolt, that was welded to a steel cross-arm on the lifting boom. The weld that held the pad eye broke, and the cables, block and shackle fell, striking Solet. Solet sued the owner of the trawler, Elvin J. Dufrene, in personam for damages, claiming negligence under the Jones Act. 46 U.S.C.A. § 688. He claims damages

both in personam against Dufrene and in rem against the vessel, for negligence under the general maritime law and for breach of the warranty that the vessel was seaworthy, as well as maintenance and cure and damages for failure to pay maintenance and cure. The case was tried without a jury.

The M/V CAPT. H.V. DUFRENE is a shrimp trawler 55 feet long and 17½ feet wide. Dufrene had modified the vessel's rigging so that two nets could be trolled simultaneously. An iron pipe was welded at right angles to the existing lifting boom to form a "T", or cross-arm. Holes were drilled in the cross-arm; the pad eyes were inserted there and welded in place to support a shackle and block. Dufrene hired a welder believed by him to be competent to do part of the work, including the welding that broke.

Dufrene let the vessel on shares to Captain Kirwin Parfait. Their oral agreement was that Dufrene would furnish the vessel, fully rigged, pay for fuel, maintenance and all repairs, plus one-half of the ice, in return for one-half of the proceeds of the shrimp catch. Captain Parfait would find a crew. Parfait and the crew would pay for all the food and one-half of the ice, and keep both one-half of the shrimp and all of the fish hauled in. Parfait would sell the shrimp to buyers selected by him and would be in full charge of the crew. The two-man crew, consisting of Solet and Joseph Billiot, in turn agreed to work on shares; 40.% of the crew's one-half would go to Parfait and 30.% to each member of the crew. The crew did not have a fixed wage agreement. Dufrene paid the crew and remitted social security taxes for them but did not deduct for income tax. Each voyage lasted from six to seven days.

██ At the conclusion of the trial the court concluded that, although Solet was clearly a member of the crew of the trawler, Dufrene was not his employer for Jones Act purposes.[1] It also con-

---

1. For Solet to recover from Dufrene under the Jones Act an employer-employee relationship must exist between him and Dufrene. Cosmopolitan Shipping Company v. McCallister, 1949, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692. Whether that relationship exists or not is a factual question to be resolved by application of common law standards to the particular relationship involved. Hebert v. California Oil Company, W.D.La.1967, 280 F.Supp. 754, and cases cited therein at page 760.

The determining factor in cases involving fishing vessels operated on a "share" system has been the degree of control retained by the owner over operation of the vessel and conduct of the fishing expedition.

Cases holding the owner to be an employer are: Southern Shell Fish Co. v. Plaisance, 5 Cir. 1952, 196 F.2d 312 (owner directed captain where to fish, whether to fish for shrimp or for oysters; required delivery of entire catch to him; decided when vessel would be in operation and when it would be laid up for repairs; made advances to captain for fuel and for other purposes; and made advances to carry crew and captain over from one voyage to another when they operated at a loss); Capital Trawlers, Inc. v. United States, S.D.Me.1963, 216 F.Supp. 440 (owner had power to discharge captain; instructed captain and crew; insured vessel; paid for all repairs, paid for all food, fuel and other supplies and for operating expenses; received payment for catches from buyers; paid captain and crew their shares of proceeds, first withholding all applicable taxes; and handled all bookkeeping details in connection with their settlements); Petition of Cherokee Trawler Corporation, E.D.Va.1957, 157 F.Supp. 414, 415 (owner's general manager had power to hire and fire crewmen; selected firm to whom catch was sold; owner filed W-2 forms providing for withholding taxes); Justillian v. Versaggi, S.D.Tex.1954, 169 F.2d 71 (owner sold shrimp and settled with crew; deducted union dues, withholding and social security taxes, and for cash advances from each crewman's share; prescribed rigid safety rules and required captain to report when any equipment was out of order).

Cases holding the owner not to be an employer are: United States v. Crawford Packing Co., 5 Cir. 1964, 330 F.2d 194, 1964 A.M.C. 1399 (owner gave no instructions to crew as to their work and how to accomplish it); Star Fish & Oyster Co., Inc. v. United States, S.D.Ala. 1963, 223 F.Supp. 402, 1964 A.M.C. 2063 (owner gave no instructions to crew

cluded that the plaintiff had failed to prove negligence on Dufrene's part; but had proved that the M/V CAPT. H.V. DUFRENE was unseaworthy because the weld attaching the pad eye to the cross-arm was defective. The court reserved ruling on the plaintiff's claim that the lifting apparatus was negligently designed.[2]

## UNSEAWORTHINESS

■■ The defendant finds proof that the weld was seaworthy in the fact that it had never failed before. Loads heavier than the one being raised when Solet was injured had been raised that day, Dufrene argues, and the weld had taken the strain. But if prior failure were the test of unseaworthiness, the only items that would not pass muster would be those that failed on initial use. This proposition therefore will not stand inspection. The test is reasonable fitness for the intended purpose—and this at the time the gear is put to use, not years before when it was bought or installed. Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed. 2d 941; Gibbs v. Kiesel, 5 Cir. 1967, 382 F.2d 917 (also a shrimp boat case); The S.S. Samovar, N.D.Cal.1947, 72 F.Supp. 574 (also involving a defective weld). *Cf.* Rawson v. Calmar Steamship Corporation, 9 Cir. 1962, 304 F.2d 202 (improper use of otherwise seaworthy equipment). In this case, the weld was defective. It failed when the gear it was holding was used for its intended purpose, to haul in a net.

## CHARTERER'S LIABILITY

■ Dufrene insists that his charter was bareboat and that he therefore does not warrant seaworthiness to one of the charter party. This is surely wrong on its face. If there is anyone to whom a warranty of seaworthiness is due, it is the person to whom the vessel is char-

as to methods to be employed in their work, or how to accomplish it; had no control over to whom catch was sold; captain was free to operate boat in whatever manner he wished; made advances to crew, but these were in nature of loans); Osland v. Star Fish & Oyster Co., 5 Cir. 1941, 118 F.2d 772 (no connection with crew, captain hired crew and had complete control over fishing activities); W. M. Webb, Inc. v. United States, E.D.La.1967, 271 F.Supp. 249 (owner exercised no control over the methods utilized by captain and crew in performing their duties).

Although the *Capital Trawlers, Inc.* case, the *Crawford Packing Co.* case, the *Star Fish & Oyster Co., Inc.* case, and the *W. M. Webb, Inc.* case involved determination of an employer-employee relationship for the purpose of the Federal Insurance Contributions Act (FICA) and the Federal Unemployment Tax Act (FUTA) and the factors to be considered are somewhat different, the test is still the same; we look to see whether a common law employer-employee relationship exists.

In the present case Dufrene did not instruct Captain Parfait and the crew where to fish, or when to fish, or how long to stay in port, or when to go out. Captain Parfait had the sole responsibility of selecting and hiring the crew; he alone formulated rules of conduct aboard the vessel, and he was indeed, although his crew was small, the Master of the vessel. He was, in effect, an independent businessman; he received no advances from Dufrene. Dufrene, Parfait, and the deckhands settled up at the end of each voyage; there was no continuing relationship between them. When they operated at a loss Dufrene never asked Parfait or the crew to make up the loss; nor did he make advances to them to carry them over from one voyage to another. The only factor indicating an employer-employee relationship is the withholding of social security taxes, which is merely one of the many factors to be considered. He exercised no control over the crew or the work nor over their manner of work. As mentioned in the *Crawford Packing Co.* case, *supra*, a factor against an employment relationship is that the crew alone shared in the fish catch as apart from the shrimp catch. There as here the captain alone decided how much fuel, ice and groceries to take aboard, where to buy the groceries, and paid for them; the crew were not paid for any incidental work such as net repair they may have done.

2. Since the court has found unseaworthiness, and a finding of negligent design would impose no additional liability, consideration of this issue is unnecessary.

tered.[3] This contractual warranty was recognized even before the warranty was extended to seamen generally[4] and, of course, long before the warranty was extended to those who are not themselves sailors but do seamen's work.[5]

■ The vessel owner's warranty is nondelegable, nor is it terminated when he relinquishes control of the vessel. Crumady v. Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 455, 3 L.Ed. 2d 413; Rogers v. United States Lines, 1954, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120, reversing 3 Cir. 1953, 205 F.2d 57; Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. It exists even as to equipment that was not furnished by the owner. Alaska Steamship Company v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, affirming 9 Cir. 1953, 205 F.2d 478. See also, Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133.

■ The warranty is not due only to those employed by the owner: it extends to all those aboard the vessel "engaged in work traditionally performed by crew members." Hebert v. California Oil Co., W.D.La.1967, 280 F.Supp. 754, 761 and cases cited therein. See also, McCown v. Humble Oil & Refining Company, 5 Cir. 1969, 405 F.2d 596, 597 and the cases cited and distinguished in footnote 2, 405 F.2d at 597; Schwartz v. Compagnie General Transatlantique, 2 Cir. 1968, 405 F.2d 270; Filipek v. Moore-McCormack Lines, 2 Cir. 1958, 258 F.2d 734, 736 and cases cited therein. Cf. Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir. 1969, 412 F.2d 1011 (May 1, 1969). This liability does not depend on any employment or consensual relationship with the injured party. Sieracki, supra; Cannella v. Lykes Bros. S.S. Co., 2 Cir. 1950, 174 F.2d 794, cert. denied, 338 U.S. 859, 70 S.Ct. 102, 94 L.Ed. 526; Hebert v. California Oil Co., supra; Grigsby v. Coastal Marine, supra. And it of course extends to fishermen, who must have been the first true blue-water sailors. See, e. g., Gibbs v. Kiesel, 5 Cir. 1967, 382 F.2d 917.

■ Even when the vessel is under a demise or "bareboat" charter, the vessel owner warrants seaworthiness. He is liable to a person injured while doing seaman's work if the injury was caused by an unseaworthy condition present when the charter was made. Cannella v. United States, 2 Cir. 1950, 179 F.2d 491, 1950 A.M.C. 858; Grillea v. United States, 2 Cir. 1956, 229 F.2d 687, rehearing, 2 Cir. 1956, 232 F.2d 919. See also, Gilmore & Black, Admiralty, 217 et seq. (1957) and I Edelman, Maritime Injury and Death, 164–165 (1960). We need not here explore the question whether the owner may be liable personally when the unseaworthy condition arises after delivery to the charterer. See, Guzman v. Pichirilo, 1962, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 and Reed v. S. S. Yaka, 1963, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448, rehearing denied, 375 U.S. 872, 84 S.Ct. 27, 11 L.Ed.2d 101.

■ The principal obligation of the vessel owner under a bareboat charter is to deliver the vessel in a seaworthy state at the commencement of the term of the charter. Gilmore & Black, Admiralty, supra at 217. Under a time charter the owner's warranty is absolute unless limited by the express terms of the char-

3. The Edwin I. Morrison, 1894, 153 U.S. 199, 14 S.Ct. 823, 38 L.Ed. 688; Work v. Leathers, 1878, 97 U.S. 379, 24 L.Ed. 1012.

"Maritime law infers a general warranty of seaworthiness from a charter-party agreement even where such warranty is not expressly made. The Caledonia, 1895, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644; Work v. Leathers, 1878, 97 U.S. 379, 24 L.Ed. 1012; Jordan, Inc. v. Mayronne Drilling Mud, Chemical & Engineering Service, 5th Cir. 1954, 214 F.2d 410. The term 'seaworthiness' is read to mean, inter alia, fitness for the use anticipated. See The Southwark, 1903, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65." Horn v. Cia de Navegacion Fruco, S.A., 5 Cir. 1968, 404 F.2d 422, 428.

4. The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760.

5. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.

ter. Work v. Leathers, 1878, 97 U.S. 379, 24 L.Ed. 1012; The Edwin I. Morrison, 1894, 153 U.S. 199, 14 S.Ct. 823, 38 L.Ed. 688; The Maurice R. Shaw, D.Me.1942, 46 F.Supp. 767, 1942 A.M.C. 1630; Wyche v. Oldendorff, E.D.Va.1967, 284 F.Supp. 575. Since the unseaworthy condition in the present case existed prior to delivery of the vessel it is irrelevant whether the charter constituted a demise charter or was instead a time charter.[6]

## PERSONAL LIABILITY

█ The vessel is liable in rem for damages caused by its unseaworthiness. Grillea v. United States, *supra*. Additionally, in circumstances similar to the present case (where the unseaworthiness antedated the charter), the shipowner has been held personally liable. Rodriguez v. Coastal Ship Corp., S.D.N.Y. 1962, 210 F.Supp. 38. In Guzman v. Pichirilo, *supra*, the district court concluded that the charter was a time charter and not, as contended by the owner, a demise charter, and gave judgment against the owner in personam and in rem against the vessel for unseaworthiness arising subsequent to the charter. The United States Supreme Court reversed the appellate court's reversal of the district court, concluding that the district court's factual determinations were not "clearly erroneous."

## QUANTUM

█ Mr. Solet, who is now 28 years old, was seriously injured. He was knocked unconscious by the blow, and, after being revived, was rushed to shore. He received first aid treatment in Houma and was transferred to the United States Public Health Service Hospital in New Orleans. Solet suffered a fractured left clavicle; fractures of the left second, third and fourth ribs; contusion of the left lung, fracture of the left acromion, and a fractured left scapula. He was hospitalized from April 13th until May 4, 1966 and was not marked "fit for duty" by the Marine Hospital until October 7, 1966. He was seen by Dr. Phillips, a New Orleans orthopedist, on September 26, 1967. At that time, the doctor observed prominent displacement of the sternoclavicular joint accompanied by marked instability of the joint that caused pain on strenuous exertion. Dr. Phillips testified that Solet's injuries would result in a 10% permanent residual disability of the left arm and shoulder with decreased strength and tolerance; that dislocation of the sternoclavicular joint is very difficult to treat and that surgery was not recommended; and that Solet would suffer continuing pain upon exertion.

Dufrene paid Solet $297.00 during the period from April 13th through June 16, 1966, claiming that all but the final check represented Solet's "share" of the last catch. The last check, for $50.00, was an advance, Dufrene testified. But he stopped making payments when he received a letter advising that Solet had retained an attorney. Amicable requests for resumption of the payments were ignored, although the defendant acknowledged that he was aware that Solet was still convalescing.

Solet was forced to borrow money to live and compelled to return to work before being discharged from treatment in order to provide for his family because the defendant ignored his clear, legal responsibility.

The plaintiff is relatively uneducated having completed only the third grade. He is married and has two children. He has worked primarily on shrimp boats and tugboats. His chances of acquiring skilled or semi-skilled work are slim. Considering the nature of Solet's injuries and these other circumstances, I fix the sum of $20,000 as an amount that will fairly compensate him for his disability, pain and suffering, and loss of future earnings. For the loss of earnings dur-

---

6. The factors to be considered in deciding whether the charter is bareboat, or instead a time charter, are enunciated in 

Guzman v. Pichirilo, 1962, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205.

ing his period of disability, the sum of $2,000 will be allowed.[7]

## CONTRIBUTORY NEGLIGENCE

██ The plaintiff was negligent in the way he attempted to land the net. But this negligence was not the sole cause of his injuries; it contributed to them in the amount of 30%. Solet's award for personal injury will be reduced accordingly. Palermo v. Luckenbach S. S. Co., 1957, 355 U.S. 20, 78 S.Ct. 1, 2 L.Ed. 2d 3.

The defendant urges that the weld failed only because of the strain put on it by Solet. It seeks to demonstrate that, if the weld had merely failed in what it calls normal use, the block would not have hit the plaintiff because the weight of the block and net alone would have caused the gear to fall short of Solet's position. It concludes that the force of the strain placed on the cable by the winch propelled the block and shackle to the point where Solet was standing. The speculative attempt to demonstrate this at length in defendant's brief with diagrams and citations to physics formulas is industrious and ingenious.

But the root of the matter is not that square: the weld did fail; the block did strike and injure the plaintiff. The fail-

ure was caused both by the unseaworthiness of the weld[8] and plaintiff's negligence. The plaintiff's negligence did exert extra stress on the line. It did result in the block being thrown with force that it would not have had if the defective weld had been the sole cause of failure. Hence it is of no consequence to speculate that the accident might not have happened in the absence of contributory negligence; in fact it happened because of the unseaworthiness and the contributory negligence.

## LATENT DEFECT

██ The defendant suggests that there is no warranty against a latent defect, citing Filipek v. Moore-McCormack Lines, Inc., 2 Cir. 1958, 258 F.2d 734, cert. denied, 359 U.S. 927, 79 S.Ct. 605, 3 L.Ed.2d 629 and Ernest Construction Co. v. Tug Commodore, S.D.Ala. 1968, 294 F.Supp. 15. In Filipek the Second Circuit Court of Appeals stated: "Clearly the shipowner is not liable for injuries caused by 'a latent defect that a reasonable inspection by the shipowner or his agents would not show.'" 258 F.2d at 737 (Citations omitted). But Filipek involved a worker to whom the warranty of seaworthiness did not run. Hence negligence, not unseaworthiness, was at issue. While a shipowner may

---

7. Solet's W-2 for 1966 indicates that Dufrene paid him total wages in 1966 amounting to $436.54. However the testimony indicated that Solet had only been on about six voyages prior to his injury. The M/V CAPT. H. V. DUFRENE was primarily engaged in "offshore" shrimping and would not have been subject to the seasonal limitations imposed on vessels fishing in "inside" waters, i. e. within three miles of the Louisiana coastline. See LSA–R.S. 56:497. Elvin Dufrene testified that the trawler was working 12 months a year. Solet's probable loss of earnings from shrimping is fixed at $400 per month, and this will be allowed for the five months that Solet was unable to work; the sum of $2,000.00

8. The defendant contends that the plaintiff has failed to prove that the weld was defective. Defendant says that, as in S.S. Samovar, N.D.Cal.1947, 72 F.Supp. 574, the plaintiff should have produced evi-

dence through the testimony of welding experts that the weld was defective from the standpoint of workmanship if the claim is to be supported. But Samovar involved a claim against the shipbuilder based on negligence, as well as a claim against the shipowner founded on unseaworthiness. "Permanente (the shipbuilder) owed libelant a general duty of care which was breached by faulty welding of the 'cargo lashing ring.'" 72 F.Supp. at 586.

Additionally, we note the cases cited and discussed in Gibbs v. Kiesel, 5 Cir. 1967, 382 F.2d 917, 919: "This Court has specifically approved the application of res ipsa loquitur reasoning to an action for unseaworthiness, noting that the logical inference is often that the gear or appurtenance would not have broken had it not been defective." See also note 3 of the court's opinion in Gibbs, supra at 919.

not be held liable for negligence for having failed to discover a latent defect not discoverable by the exercise of due diligence, it is not essential to his liability for breach of the warranty against unseaworthiness, that he have notice or knowledge of the defect. Indeed, the liability is absolute; no amount of care will suffice if it is breached. Mitchell v. Trawler Racer, Inc., *supra*; Boudoin v. Lykes Bros. S. S. Co., 1955, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354; Alaska Steamship Co. v. Petterson, *supra*; Mahnich v. Southern S. S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; Adams v. United States, 9 Cir. 1968, 393 F.2d 903. The defendant's reliance on the *Ernest Construction Company* case, *supra*, is therefore also misplaced because that case involved maritime tort and did not deal with the warranty of seaworthiness.

## MAINTENANCE AND CURE

Dufrene contends that he is not personally liable for maintenance and cure because the right to maintenance and cure arises solely from the contract of employment; that the same test used to determine whether there is an employer-employee relationship under the Jones Act must be used to determine employer-employee status for purposes of maintenance and cure; and that, since the court found that he was not Solet's employer for Jones Act purposes,[9] it follows that he is not Solet's employer for purposes of maintenance and cure liability. Dufrene argues that Solet, Parfait and Billiot were "joint venturers" and must be considered their own employers and that, since liability for maintenance and cure arises solely out of the employment relationship, the M/V CAPT. H.V. DUFRENE is not liable in rem for this claim.

"The seaman's right to maintenance and cure for illness or injury occurring while he is in the service of the ship is often analogized to workmen's compensation." Gilmore & Black, Admiralty, 253 (1957). But, "The analogy to workmen's compensation is on the whole misleading. * * * The shipowner's liability for maintenance and cure resembles that of an employer subject to a Workmen's Compensation Act only in that it is a liability without fault which is based on the employment relationship." *Id.* at 254.

█ The liability may be asserted by a member of the crew by an action in personam against the employer or by an action in rem against the vessel. The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760.[10] "Since the right arises out of the employment relationship, the employer is the person liable." Gilmore & Black, *supra*, at 256. The right to enforce this liability against the vessel arises from "the peculiar relationship existing between the seaman and his vessel." I Norris, Seamen, 592 (2d ed. 1962). *See, e. g.,* The Montezuma, 2 Cir. 1927, 19 F.2d 355 and The Edward Peirce, S.D.N.Y.1939, 28 F.Supp. 637. *See also* the cases cited in Norris, *supra*, at 606 n. 1.

█ In the Jones Act, Congress imported a common law standard and a common law test of employer-employee relationship to create a new liability to seafaring men. In determining who is the employer with respect to liability for maintenance and cure, the same criteria apply as those applicable in determining liability under the Jones Act. Fink v. Shephard S. S. Co., 1948, 337 U.S. 810, 69 S.Ct. 1330, 93 L.Ed. 1709; Hebert v. California Oil Co., W.D.La. 1967, 280 F.Supp. 754; Sims v. Marine Catering Service, Inc., E.D.La.1963, 217 F.Supp. 511. Since Dufrene is not to be considered Solet's employer for Jones Act purposes, it follows that he may not be considered Solet's employer for recovery of maintenance and cure.

---

9. See note 1 *supra*.

10. *See also*, The Transfer No. 12, 2 Cir. 1915, 221 F. 409; Brown v. D. S. Cage, Cir.Ct.Tex.1872, Fed.Cas.No.2,002; The Edward Peirce, S.D.N.Y.1939, 28 F. Supp. 637, 1939 A.M.C. 1260.

Hence, there can be no recovery against Dufrene in personam for this claim.

But the question of liability of the vessel in rem must be resolved in a different fashion. The liability for maintenance and cure is an ancient one,[11] and its basic principles had evolved long before the Jones Act was adopted. Historically the general maritime law has recognized the seaman's special dependence on his vessel. Where a similar arrangement to fish for a share of the catch was involved, the Court of Appeals for the Fourth Circuit recognized a lien for wages against the vessel. Old Point Fish Co., Inc. v. Haywood, 109 F.2d 703, 1940 A.M.C. 145. The court said,

> "There is nothing novel or unusual of itself in the kind of an oral agreement that we have here between the owner of the vessel and the crew for their compensation on a fishing voyage. Such an arrangement has been common practice from ancient times, United States v. Laflin, 9 Cir., 24 F.2d 683; 56 C.J. 1058. In such situations the fishermen crew are treated as seamen, and there have been numerous judicial decisions enforcing the rights of the crew against the owner and the ship."

But reliance need not be rested on analogy alone. In The Edward Peirce, S.D.N.Y.1939, 28 F.Supp. 637, 1939 A.M.C. 1260, the right of a seaman to libel a vessel under a bareboat charter for maintenance and cure was recognized. The court said:

> "The cases seem to hold that the employment of a seaman on a vessel gives rise in effect to two relationships; (1) the contractual relationship between the seaman and the operator of the vessel who hires him, whether the operator be the owner or a charterer, and (2) the personal indenture between the seaman and the vessel. Regardless of who the operator of the vessel may be, or on what terms, the personal indenture exists between the seaman and the vessel, and that would seem to be a basis for his right to libel the vessel herself for his maintenance and cure when he sustains an injury (other than through his own gross and wilfull misconduct), while he is thus employed in the line of duty or in the service of the ship."

Nor does this decision stand alone.[12]

■ Although the employer alone is personally liable, the right to maintenance and cure does not arise solely out of the contract of employment. "Maintenance and cure is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; it extends during the period when he is incapacitated to do seaman's work and continues until he reaches maximum medical recovery." Vaughn v. Atkinson, 1962, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88.

■ While Solet's failure to prove a common law employer-employee relationship prevents him from recovering damages under the Jones Act and maintenance and cure from Dufrene personally it does not prevent him from acquiring a lien, enforceably by an in rem proceeding against the trawler, for this claim under the older standards applicable in determining liability for maintenance and cure.

There remains the argument that Solet was himself a co-charterer of the vessel and that this deprives him of his claim against the vessel. No authority is cited for this suggestion. There is no evidence that Parfait alone or the Parfait-Solet-Billiot fishing venture agreed to

---

11. For an historical account see Hudspeth v. Atlantic & Gulf Stevedores, Inc., E.D. La.1967, 266 F.Supp. 937, 939–941.

12. See also The Georgiana, 1 Cir. 1917, 245 F. 321, 325; The Montezuma, 2 Cir. 1927, 19 F.2d 355; Gilmore & Black, Admiralty, 257; the cases cited in Norris, Seamen, at page 606 n. 18; and the discussion in Robinson, Admiralty, 281–282 (1939).

indemnify the owner of the vessel against seamen's claims for maintenance and cure. In the absence of authority for implying such an indemnification, the court will not thus abridge the fisherman's remedy for maintenance and cure.

"The amount of maintenance to which an injured seaman is entitled is a factual question. Some courts have measured it by the amount necessary to provide meals and lodging ashore of the same character that were furnished aboard ship; but other authorities say the amount is to be based on proof of the seaman's out-of-pocket expenses. Maritime union contracts frequently fix the daily maintenance rate and this rate is usually applied to seamen covered by the contract. At least one text writer says that 'even if there is no union rate applicable to a particular case, a court may take judicial notice of the amount fixed by union agreements in the area.' Courts have sometimes considered the union contract rate as persuasive of the reasonableness of the sum fixed even when it is not directly applicable, or as admissible evidence in the absence of other proof, or at least one factor tending to show the reasonable value of maintenance. The Court of Appeals for the Fifth Circuit has said that 'the seaman's recovery must be measured by the reasonable cost of that maintenance and cure to which (the plaintiff) is entitled at the time of the trial. United States v. Robinson, 5 Cir. 1948, 170 F.2d 578. This means the reasonable cost of meals and lodging ashore of a type that the injured seaman would normally require." Hudspeth v. Atlantic & Gulf Stevedores, Inc., E.D.La.1967, 266 F.Supp. 937, 944. See also Phillips v. Boatel, Inc., E.D.La.1968, 280 F.Supp. 475 and Sylvester v. Offshore Food Services, Inc., 217 So.2d 430 (La.App.

1968). The evidence before me indicates that a proper maintenance rate would be $8.00 per day.

The plaintiff is entitled to maintenance for 156 days at $8.00 a day, or $1,248.00, plus $52.00 expended by him for first aid treatment. Solet left the Public Health Service Hospital on May 4, 1966 but was not discharged by the Hospital as fit for duty until October 7, 1966. In addition, the plaintiff is entitled to recover attorney's fees and damages for the willful failure to pay maintenance clearly due. As in Vaughn v. Atkinson, 1962, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88, the shipowner was callous in his attitude, and suspended payments as soon as Solet retained counsel. I find his default "willful and persistent." See discussion in *Hudspeth, supra,* 266 F.Supp. at 945. The court will hear evidence to determine the amount of damages, if any, and a reasonable attorney's fee. Solet's recovery for maintenance and cure and for damages for failure to pay maintenance and cure is, of course, not subject to reduction because of Solet's contributory negligence. Fitzgerald v. United States Lines Co., 1963, 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720.

The Clerk is therefore directed to enter judgment for maintenance and cure in rem against the M/V CAPT. H. V. DUFRENE for $1,248.00, plus $52.00 for plaintiff's expenditure for first aid, and against the M/V CAPT. H.V. DUFRENE in rem and against Elvin J. Dufrene in personam for $15,400.00 ($22,000.00 less 30% contributory negligence) as damages for personal injuries and loss of earnings, with interest at the rate of 5% per annum until paid. This opinion will serve in lieu of findings of fact and conclusions of law.