Robert B. GIBBS, Appellant,

v.

Hilbert KIESEL and Kiesel Bros., Inc.,
Appellees.

No. 24209.

United States Court of Appeals
Fifth Circuit.

Aug. 25, 1967.

Norman Miller, Miami, Fla., Jacob Rassner, New York City, for appellant.

Robert L. McDonald, Malory B. Frier, Tampa, Fla., for appellees.

Before WASHINGTON,* TUTTLE and SIMPSON, Circuit Judges.

* Of the District of Columbia Circuit, sitting by designation.

SIMPSON, Circuit Judge:

Libel was filed below by Robert B. Gibbs against Hilbert V. Kiesel, the owner of the shrimp boat CEE DOT, and Kiesel Bros., Inc.[1] Gibbs was a crewman aboard the CEE DOT, whose job was to dehead the shrimp after they had been netted and landed, and prior to icing down. Gibbs was injured on November 17, 1963, when wooden "doors" to the shrimp net fell on him and knocked him to the deck. Gibbs was struck in the head by the doors and broke his wrist as a result of his fall. The libel contained claims (1) of negligence under the Jones Act, (2) unseaworthiness, and (3) for maintenance and cure. The jury found for Kiesel on all issues and Gibbs appealed.

The primary issue on this appeal is whether the vessel was unseaworthy as a matter of law. We hold that it was, and reverse for retrial on the issue of damages alone with respect to this claim.

At the trial Kiesel introduced no testimony as to how the accident occurred. The apparent defense strategy was to rely on the uncertainty of Gibbs' testimony in many respects to defeat his recovery. The sole account of the accident is found in the testimony of Gibbs.

On the day in question, the CEE DOT was engaging in shrimping operations in the Tortugas area. The weather was rather rough, and for some unexplained reason the vessel was having trouble with her steering mechanism.[2] The steering difficulties were causing the vessel to wallow broadside in the trough of the waves rather than head into the wind. The combination of steering difficulties and rough seas produced a side-to-side rolling of the ship. The rolling of the ship caused Gibbs and the other crewman to slide on the deck and Gibbs started across the deck to find a safer location in the deck house. Gibbs acknowledged

that he did not seek the permission of Jerome Cooper, the captain, before starting to go inside. The two "doors" that hit Gibbs as he started inside were large heavy slabs of wood and steel about forty inches high and some eight or nine feet long. Gibbs explained that the "doors" were kept overboard while shrimping, their function being to spread open the nets. After a catch was made the "doors" were pulled up on deck by cables to an upright position near booms used to lower and retrieve them. They were tightened down and made secure by the captain. Apparently, Gibbs assisted Cooper in securing the doors on the day in question, but the general operation was Cooper's responsibility.

Gibbs testified that he was struck from behind by the doors, and that he did not see what caused the doors to fall. Kiesel places great emphasis on Gibbs' inability to point to a particular defect which would have caused the doors to fall. Gibbs candidly acknowledged that he could not say that he *knew* one of the cables holding the "doors" had come loose, allowing them to fall. Summarily stated, the position of Kiesel is that absent affirmative proof of a specific defect, there can be no finding of unseaworthiness. On the other hand, Gibbs urges that the doors were in some way defective or they would not have fallen.

■■ Seaworthiness is a relative concept, depending in each instance on the particular circumstances. The owner owes an absolute duty to provide a seaworthy vessel; however the absolute duty is only to furnish a vessel and equipment reasonably fit for their intended use. Morales v. City of Galveston, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962); Marshall v. Ove Skou Rederi A/S et al., 378 F.2d 193 (5 Cir. 1967).

The test is phrased as follows in Walker v. Harris, 335 F.2d 185, 191 (5 Cir.

1. Kiesel Bros., Inc. was dismissed from the action by stipulation of counsel.

2. The appellant did not emphasize the steering mechanism malfunction as estab-

lishing unseaworthiness, but chose instead to base his claim in this respect upon the actual falling of the doors.

1964), cert. den. 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342 (1964):

"The subsidiary questions leading to ultimate conclusion of seaworthiness are therefore: what is the vessel to do? What are the hazards, the perils, the forces likely to be incurred? Is the vessel or the particular fitting under scrutiny, sufficient to withstand those anticipated forces? If the answer is in the affirmative, the vessel (or its fitting) is seaworthy. If the answer is in the negative, then the vessel (or the fitting) is unseaworthy no matter how diligent, careful, or prudent the owner might have been. Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, 1960 AMC 1503."

*Trawler Racer*, supra, goes further and disclaims that the owner is obligated to furnish an accident-free ship. The Court states:

"The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941, 948.

Numerous cases have rejected the argument of appellee that liability for unseaworthiness can be avoided by the ship owner's disclaimer of knowledge of the cause of the accident, Van Carpals v. SS American Harvester, 297 F.2d 9 (2 Cir. 1961), cert. den. 369 U.S. 865, 8 L.Ed.2d 84, 82 S.Ct. 1031 (1962); or relying on the failure of the proof to reveal the particular defect. In Re Read's Petition, 224 F.Supp. 241 (S.D. Fla.1963.)

This Court has specifically approved the application of res ipsa loquitur reasoning to an action for unseaworthiness, noting that the logical inference is often that the gear or appurtenance would not have broken had it not been defective.[3] Marshall v. Ove Skou Rederi A/S et al., supra. Judge Rives, concurring in *Marshall*, also observed that "[t]here is simply no explanation for the accident * * *"

Applying this background to the present facts there can be little doubt that the doors were being put to their "ordinary intended use". Gibbs testified on cross-examination that the doors had been placed on the deck "like we usually do". The doors fell either because a cable broke or because they were improperly tied down. Either condition rendered the ship unseaworthy.

In Vega v. The Malula, 291 F.2d 415, 419–420 (5 Cir. 1961) the Court found a vessel unseaworthy after a sheave came out of a block when a pin unaccountably slipped out. Particularly significant to the instant case is the Court's observation:

"The event occurred. The block failed. The block failed while being used for a normal expected purpose. That is, and has been, at least since Sierazki [sic] in 1947, a classic case of patent unseaworthiness.

\* \* \* \* \* \*

"How the pin happened to slip out is of no real legal significance."

Likewise, we believe, it is of no real significance how or why the "doors" fell. The fact that they fell during ordinary intended use indicates a defective condition; therefore rendering the CEE DOT unseaworthy as a matter of law.

The remaining issue is the amount of damages suffered by Gibbs. At the trial appellee attempted to show that Gibbs was contributorily negligent

---

3. But note that the doctrine of *res ipsa loquitur* in admiralty cases is only similar to the doctrine in ordinary tort law. One distinction is that *res ipsa loquitur* in tort law requires that the accident be one that would not ordinarily occur without negligence. The negligence concept plays no part in unseaworthiness. Van Carpals v. The S.S. American Harvester, 297 F.2d at 11.

in that he participated to some degree in lashing down the doors and in consciously electing to expose himself to the risk that the doors might fall. On remand, these contentions tending to show contributory negligence on the part of Gibbs may be considered in mitigation of damages, although not as an absolute bar to recovery, Symonette Shipyards Ltd. v. Clark, 365 F.2d 464, 469 (5 Cir. 1966), nor as assumption of risk. Ballwanz v. Isthmian Lines, Inc., 319 F.2d 457, 462 (4 Cir. 1963).[4]

Retrial upon remand will be limited to the issue of damages, with the jury instructed that Gibbs is entitled to recovery upon the issue of unseaworthiness. As indicated, proof of Gibbs' contributory negligence may be offered in mitigation of damages.

The remaining issue is Gibbs' appeal from the jury's denial of recovery for maintenance and cure. The record reveals a substantial amount of confusion on this issue, resulting primarily from Gibbs' prior history of mental disorders plus a subsequent physical injury suffered after the injury aboard the CEE DOT. The record discloses that a total of $100.00 was disbursed from Kiesel to Gibbs to be applied as maintenance and cure. The parties stipulated to the following:

> "In the event the plaintiff is entitled to any maintenance which he has not already received, that the rate of maintenance be computed at the rate of $6.00 per day."

Immediately after the accident Gibbs was treated at the U.S. Naval Hospital in Key West, Florida, after which he was a patient in the Public Health Service Hospital in Savannah, Georgia, from November 30, 1963, to February 28, 1964. The prognosis at the time of the discharge from the Savannah hospital was that Gibbs could return to normal work "within six weeks barring any complication".

The Court charged the jury with reference to maintenance and cure as follows:

> "If the jury finds that the Plaintiff was unfit for duty and could not work in his occupation, he would be entitled to the sum of six dollars per day for each and every day he was unable to pursue his occupation except for the time that he was hospitalized. This principle is called Maintenance and Cure. The obligation of the Defendant to furnish maintenance and cure ceases when the Plaintiff has reached a point of maximum medical care, as you may find from the evidence.

> \*    \*    \*    \*    \*    \*

> "The Court further instructs the jury that if you find from the evidence in the case Plaintiff is entitled to recover what has been designated as maintenance and cure, then the jury should allow the same at the agreed rate of six dollars per day on the following basis as you may find from the evidence:

> "From the date of injury to the date of maximum medical cure, less all days you find he was confined in the United States Public Health Service Hospital, and less any further days you find he has already been paid for by the shipowner, as you find from the evidence."

■■ We conclude that the jury was properly instructed as to maintenance and cure. Simple mathematical computations disclose a possible pro-rating by the jury of the $100.00 at $6.00 per day

---

4. *Ballwanz* was noted with approval in Marshall v. Ove Skou Rederi A/S et al., 378 F.2d 193 (5 Cir. 1967). Since we decide that the vessel was unseaworthy as a matter of law it is unnecessary to embark on an extended analysis of Gibbs' further contention that the Court erroneously commingled principles of common law negligence with the principles of unseaworthiness in its charge to the jury. However, a thorough discus-

sion of the point is found in Ballwanz v. Isthmian Lines, Inc., supra, where it was held to be error to repeatedly emphasize in the jury charge the words "reasonable", "reasonably" and "unreasonable" to such extent that the affirmative aspects of unseaworthiness are diluted to the point where the jury may be confused into thinking it must find negligence in order to hold the owner liable.

for a period of 16⅔ days. The jury could have reasonably concluded that maximum cure was reached at that time. Any further allowance of maintenance and cure based on aggravation of a pre-existing schizophrenic condition is a matter of genuine conflict between medical testimony, the resolution of which was properly left to the jury.

We affirm the jury verdict with respect to the Jones Act negligence count, and disallowance of additional maintenance and cure, but reverse for trial of the issue of damages under the unseaworthiness count.

Affirmed in part; reversed and remanded in part.