Jerry **BENTON**, Appellant,

v.

**WHELESS DRILLING COMPANY**,
Appellee.

No. 15397.

Court of Civil Appeals of Texas.

Houston (1st Dist.).

April 17, 1969.

Rehearing Denied May 8, 1969.

Brown, Kronzer, Abraham, Watkins & Steely, Houston, for appellant; W. James Kronzer, Dale Harvill, Houston, of counsel.

Vinson, Elkins, Searls & Connally, William R. Eckhardt, III, Houston, for appellee.

COLEMAN, Justice.

This is an admiralty suit brought by Jerry Benton, the employee of an independent contractor, to recover damages against a vessel owner, Wheless Drilling Company,

for injuries received by him while working at unloading pipe from the vessel, which was located in navigable waters. A judgment based on a jury verdict was rendered for the defendant.

Appellant was injured when a heavy drill pipe rolled from the pipe rack of appellee's submersible drilling barge down onto the floating cargo barge in which appellant and two other employees of the James Casing Crew were working stacking pipe.

The James Casing Crew, Inc. was hired by Wheless Drilling Company to come aboard its vessel and assist its crew members in discharging pipe from the vessel onto the cargo barge tied up alongside, and then to run casing into the well drilled on this site by appellee. When they reached the scene the vessel was rigged to discharge the pipe. The cargo barge was in place alongside the pipe rack. The guard rail, normally set along the outer edge of the pipe rack to prevent pipe falling overboard, had been removed and two pipe runners had been put in place leading from the drilling barge down into the cargo barge.

The pipe racks were located on the front of the drilling barge on either side of a solid metal catwalk six feet in width. The pipe racks and the catwalk were about six feet above the lower deck of the drilling barge. The drilling platform and the derrick were located toward the middle of the barge. The platform was eight to ten feet above the catwalk. A "V" shaped chute, called the V-door, set in the drilling platform led down to the catwalk. Back of the drilling platform was the engine room and at the end of the barge were living quarters. Along the edge of the pipe racks some 3″ holes were·cut into the "H" beams in which two-inch pipes could be placed, to prevent pipe from rolling off. There were three of these holes. No chocks were in place when the crew arrived, and none were used prior to the accident.

As soon as the Casing Crew changed into their working clothes the operation of removing the drill pipe began. Appellee's employees were pulling the pipe from the hole. As one joint of pipe cleared the platform, the string of pipe in the hole was secured and top joint unscrewed. This joint was swung out over the catwalk and released in the V-door. It would slide down the V-door onto the catwalk guided by one of the men in the Casing Crew. Another one of the James Casing Crew, Inc. men and one of appellee's employees would then roll this joint of pipe onto the pipe rack and remove the protective rubber. One of them would then roll it out of the way on the pipe rack. Meanwhile another length of pipe would be coming down the V-door. It appears that the James Crew man would also push the pipes over the side onto the runners. It would then roll down into the cargo barge, which was some six feet or more below. Three members of the James Crew were in the cargo barge. It was their duty to straighten the pipes out and see that they were properly stowed. The other man in the Casing Crew was on the drilling barge, but not on the pipe rack.

Prior to the accident some thirty-five to fifty joints of pipe had been rolled down into the cargo barge. The men in the cargo barge were "working on the second layer." There were a number of joints of pipe on the pipe rack. The James Crew had been working between thirty minutes and an hour.

N. C. Coffman, Jr., appellee's tool pusher, was in overall charge of the operations. His position corresponds to that of a captain of a ship. He was on board and had been watching the operation. At the time of the accident he was resting in the living quarters. He testified that they were getting ready to set the production string and that he called on the James Casing Crew to help him lay down the drill pipe and put the casing in because he needed more hands than he ordinarily had in his crew. He said that no one with the casing crew talked to him about how they were going to load the pipe aboard the cargo barge. He left that up to them. It was their job to "load

it out." He did not tell them how to go about doing their work.

He testified that it was appellee's obligation to furnish the casing crew the means to get the pipe from the pipe rack onto the cargo barge. It was his job to see that the drilling rig and the equipment on it was in good operating order. If he saw someone on the vessel doing something in an unsafe manner, it was his duty to correct the situation. If he had thought that it was unsafe for the James Casing Crew to do the work they were doing in the way they were doing it with the equipment they had available, he would have corrected them. The guard rail stays up on the pipe rack all the time until preparations are made to load something out. He could not remember seeing any chocks out there on the pipe rack before the accident. He did not tell the casing crew where any equipment was that was not in the vicinity of the pipe rack. He didn't notice whether they were using chocks. He didn't see any chocks and it is customary that they be made available. He testified that if there were too many joints of pipe on the rack and someone was working below it, the 2″ pipe can be put in the 3″ holes on the edge of the pipe rack and the pipe can't roll off. Chocks are customarily put up when the work of rolling the pipe off the pipe rack is stopped for awhile. He said that the 2″ pipe usually is kept at the pipe rack, but he couldn't "specify about that one night." He said that there are always pieces of wood that could be used as chocks.

He testified: "Well, if you get too many too far ahead, laying the pipe down, you get stacked up too many joints on the pipe rack and they are not getting them loaded out on the cargo barge fast enough, you would have to chock it, just safety first to keep it from rolling off the barge, not that it would roll off, but men working up there taking rubbers off or trying to straighten the pipe around, they could roll off, but if they've got too many up there they should chock the pipe."

He also testified that it was safer to have two men with soft ropes at either end of the rack to slow the roll of the pipes. Rope was available for this procedure. It was not usual for a crew to shove four or five pieces of pipe over the edge at one time because it would make more work in "trying to straighten it up."

Freddie Hebert, one of appellee's employees, was called as a witness by appellee. Prior to the accident he was working on the pipe rack removing the rubbers. He didn't remember when the railing was taken off or who took it off. Quite a few pipes, maybe 20, had been rolled off the pipe rack into the barge before the accident. About 15 pipes were on the pipe rack at the time of the accident. He did not see the pipe that hit appellant roll off, and he did not roll it off. None of the other men could have rolled it off. The barge was level and they had had no trouble with rolling pipe. Two-inch pipe was usually used as chocks to keep pipe from rolling off the pipe rack. Pieces of 2″ pipe were available the night of the accident. Pieces of wood could be used as chocks and wood was available.

Hebert was asked what caused the pipe to roll and stated: "It could be an unlevel pipe rack, vibration from laying down one joint from out the V-vibration from laying down pipe from out the V into the ramp. Vibration of the rig. Anything could have caused it to roll, or maybe a little dent in the pipe." He also stated: "* * * The only thing I think that could cause it to roll is vibration of the drilling rig. * * *." He testified positively that the drilling rig was being operated at the time of the accident. He could feel the vibrations.

Russell Dupree, the driller, was offered as a witness by appellee. He testified that there was a little vibration when he was "coming out of the hole," but that there was not an unusual amount of vibration. He had not noticed a tendency of the pipe to roll around while vibration was present. The barge was level. Just prior to the ac-

cident he was shut down and had been for ten or fifteen minutes at the request of Hebert and "the other casing hand". They had gotten behind on taking off the rubber protectors and had six or eight joints of pipe on the pipe rack. He said that when the "draw works is shut down," there is no vibration at all. He testified that wooden chocks could be used to keep the pipe from rolling off the rack and that 2″ pipe could be put in the 3″ holes on the edge of the rack. Two-inch pipe was available, and lots of wood suitable for use as chocks. Both pipes and wooden chocks were available on the barge in the vicinity of the pipe rack that night. However, he testified that while they were "coming out of the hole" he wasn't anywhere around the pipe rack. He had no occasion to actually go out on the pipe rack and know what was there and what wasn't. He was not in a position to see anything on the pipe rack because he was tending to his own job "coming out of the hole".

Members of the casing crew testified that the pipe rack was already set up for discharging pipe when they arrived. The railing was down and no chocks were in place. They were provided nothing to use as chocks. They didn't see any pipes or wood suitable for use as chocks. Jerry Darcy, the foreman of the casing crew, testified that just before the injury they had a full rack of pipe, about twenty-five joints, on the pipe rack and were trying to get caught up and he asked the driller to "hold off a minute" and "he just started to sling the pipe around". The rig was still in operation at the time of the accident. He thought that the vibration caused the pipe to roll off. The drilling barge was as level as they could get it but it wasn't level. He looked for "a pipe or something to stick in there" to use for chocks. He looked in the cellar and on the pipe rack. Chocks should be used when the work is shut down. If any sort of chock had been used, the piece of pipe couldn't have rolled off. There wasn't anybody around to hold back the pipe. He didn't think that his men could have caused

it by knocking pipes together because there was a lot of pipe on the rack. He was "pretty sure" the vibration caused it to roll off.

Robichaux testified that Esco Benton had rolled a piece of pipe to the edge of the rack, when he told Esco to roll it back because they "were fixing to roll some on the runners". Esco rolled it back about five feet from the edge. While Robichaux and Theriot were holding up the runners, "the driller latched onto a joint of pipe in the hole, vibrating the rig which was leaning, * * * causing the pipe to roll down the runners which we had raised high, * * *" It then struck appellant, who was engaged in rolling pipe back under the runners. He testified: "Whenever you are coming out of the hole you latch onto the pipe in the rotary. If you don't let your block settle down you will shake the whole rig." Although he was on the cargo barge, he felt vibrations that night, and specifically before this pipe rolled. They were working on their second row and had laid down about 50 or 60 joints before the accident. The vibrations from the driller's operations occurred in connection with just about every joint that came out of the hole. The runners came down into the barge in such a manner that about half of the pipe on each row had to be rolled under them. There were no chocks, no pipe to put in the holes in the pipe rack. He looked for them both before and after the accident. He testified: "All we had was two-by-fours on the pipe barge." They needed pipe or four-by-fours because the vibration of the rig would have broken two-by-fours. He also testified: "It [the pipe] wouldn't have rolled if the rig hadn't shook." He said that while they had no problem with pipe rolling before the accident, there was no reason to stop the pipe from rolling because they "rolled them as fast as they came out of the pipe rack." They were rolling them down as fast as they came out of the V-door.

Esco Benton testified that he was working at the V–door guiding the pipe. The

operations were shut down for the first time after the accident. The guard rails were down because the pipe couldn't be unloaded by the method they were using if it was up, but that pipe chocks could have been put in the holes and taken out each time pipe was to be rolled over the side. He did not see any chocks available, although it was a frequent practice to use them. He noticed the vibration especially when they were "laying down a joint". The barge was leaning. He didn't actually see the pipe roll off the rack. He didn't actually know what caused the pipe to roll. He looked around the pipe rack and didn't see any chocks. He couldn't leave his post to look for chocks and he didn't know whether anyone else "went and looked for any".

He testified that they would get two, three, or maybe four pipes and roll them over. He didn't remember them rolling one at a time. "They rolled them over as fast as they could get them over."

Jerry Benton, appellant, testified that just before the accident "they had come out of the hole with several joints of pipe, and they gave us the signal to stand clear, that they were going to roll some pipe off the pipe rack onto the cargo barge where I was at, and we stood back and they rolled off several of these joints.

"* * * we were given the signal to set them in place, and we started setting this pipe in place. This happened two or three times like this. I don't know exactly how many joints they had rolled *off* the *cargo* barge for us to receive, and this went on for maybe ten or fifteen minutes, I suppose, and they gave us the signal to set some more pipe in place that had been rolled over, and this pipe that they had rolled over was completing a layer * * * and these skids had to be picked up so that the drill pipe could be rolled under, next to the cargo barge, in order to make a complete rack of pipe, a complete layer of pipe. * * *"

He testified that after he got on the cargo barge, he couldn't see up on the pipe rack and didn't know that there was a place to insert chocks. He did not look for any chocks and didn't know whether any were used. If chocks had been used, the pipe couldn't have rolled off. He had not noticed any tilting of the barge and didn't know what caused the pipe to roll off.

Appellant relies on three points of error reading:

1. "The jury's answer to Special Issue No. 3 is not supported by any evidence and the Court erred in failing to disregard the jury's answer to Special Issue No. 3, and hold as a matter of law for purposes of entering a judgment for Appellant upon the remaining verdict that the pipe rack on the drilling vessel was unseaworthy causing injuries to Jerry Benton because the undisputed evidence conclusively shows that the pipe rack had no chocks or anything else in place on it to retain pipe until the pipe could be discharged from the pipe rack to the cargo barge below.

2. "The jury's answer to Special Issue No. 6 is not supported by any evidence and the Court erred in refusing to disregard the jury's finding to Special Issue No. 6 and thereafter enter judgment for Appellant because the unseaworthy condition of the cargo boom on the Wheless Drilling Company vessel on the occasion in question as found by the jury in answer to Special Issue No. 5 played a part in the occurrence giving rise to the injuries and damages suffered by the Plaintiff as a matter of law from the evidence in this case.

3. "The Wheless Drilling Company vessel was rendered unseaworthy, causing injury to Jerry Benton, by the failure of Wheless Drilling Company to provide to James Casing Crew, Inc. chocks for use on the pipe rack to hold pipe in place until it could be discharged from the pipe rack to the cargo barge."

Special Issues Numbers 3 and 6 read:

3. "Do you find from a preponderance of the evidence that the absence of

chocks in place on the pipe rack so as to prevent the pipe from rolling off the Wheless Drilling Company vessel at the time of the accident rendered the pipe rack not reasonably suited for its intended use?

6. "Do you find from a preponderance of the evidence that such condition of the crane, if you have so found, played any part in causing Jerry Benton's injuries?"

The jury found that the crane referred to in Special Issue No. 6 was not reasonably suitable for its intended use. There was evidence that the casing crew wanted to use the crane to unload the pipe rather than sliding it off the pipe rack, and that had a crane been used the guard rail would not have been taken down, and pipe could not have rolled off the pipe rack into the cargo barge. There was also testimony that the casing crew choose the method of unloading and that the crane was in good operating condition. We have concluded that the trial court did not err in refusing to disregard the answer made by the jury to Special Issue No. 6. Marshall v. Ove Skou Rederi, A/S, 378 F.2d 193 (5th Cir. 1967).

In the case cited the Court said:

"While developing the testimony of customary gear both parties went fully into whether the sling should have been made of cables as contended by libelant, or of chains as claimed by shipowner. Whether shipowner should have used a better or safer appliance or gear is not the real question, but whether under all the circumstances the slings used were reasonably safe. Doucette v. Vincent, supra [194 F.2d 834, 1st Cir. 1952]. The emphasis in testimony and decree on chains vs. cable (and use vs. non-use of chocks) indicates that parties and Court tended to consider the case governed by a choice between them. This is a misconception. Even if the Court had thought cables the best the shipowner had no duty to supply the best, or the most modern, or perfect gear, so long as reasonably suitable. Doucette v. Vincent, supra; Manhat v. United States, 220 F.2d 143 (2d Cir.), cert. denied, 349 U.S. 966, 99 L.Ed. 1288, 75 S.Ct. 900 (1955)."

The jury found that the crane was not reasonably suitable for its intended use. Had it been in good repair, and had it been used, appellant would not have been injured in the manner that he was injured. The question, however, is whether the gear actually furnished and used was reasonably fit for the use intended under the existing circumstances. If it was not reasonably fit for such use, the ship was pro tanto unseaworthy. If it was suitable, the fact that the use of other equipment might have been a safer procedure, and might have prevented the accident, is immaterial.

The trial court submitted a series of special issues designed to ascertain whether appellant was negligent in failing to use chocks to prevent the pipe from rolling off the rack. The jury answered the first issue in the series "We do not," thereby failing to find that chocks were available to be used at the time of and just before the accident. By point number three appellant contends that the trial court erred in failing to hold as a matter of law that the vessel was rendered unseaworthy by the failure of the owner to provide chocks for use on the pipe rack. There is no jury finding that the owner did so fail. C. & R. Transport Co. v. Campbell, 406 S.W.2d 191 (Sup.1966). Russell Dupree testified that both pipe and wooden chocks were available on the barge at the far end of the pipe rack the night of the accident. On cross-examination, however, he testified that after he started "coming out of the hole" he wasn't anywhere near the pipe rack and didn't see anything on the pipe rack. Hebert also testified that both pipe and wood were available for use as chocks. Coffman testified that there are always pieces of wood available for use as chocks. Neither Hebert nor Coffman testified specifically that wood or pipe was on the pipe rack or

in its immediate vicinity. Robichaux testified that there were two by fours on the pipe barge. The members of the casing crew testified that they did not see any chocks in the vicinity of the pipe rack, and several testified that they found none after making a search. The evidence raised an issue of fact as to the availability of chocks. No complaint is made of the failure of the court to submit issues to the jury.

■ It is uncontroverted the chocks were not used. If an unseaworthy condition existed, it resulted from the failure to use chocks. It is uncontroverted that the use of chocks would have prevented the pipe from rolling off the rack. If the pipe rack was reasonably suited for its intended use, without chocks in place at the time of the accident, the failure to furnish such chocks would not render the vessel unseaworthy. Marshall v. Ove Skou Rederi A/S, supra. This question was submitted to the jury in Special Issue No. 3, and the jury failed to find the pipe rack, under those conditions, not reasonably suited for its intended use.

The real issue is whether, as a matter of law, the ship was unseaworthy because chocks were not in place on the pipe rack prior to the accident under the conditions then existing.

There was testimony that the pipe which injured appellant was rolled up to the edge of the pipe rack by a member of the James crew. At the request of one of the men working in the pipe barge, he rolled it back about five feet from the edge to give the men on the pipe barge time to lift the pipe skids and roll pipe under them. This pipe was left unattended for an indefinite length of time. It was the procedure for a warning to be given the men in the pipe barge before pipe was rolled off the rack. Chocks had not been used during the thirty minutes to an hour that the work had proceeded. It was customary for several lengths of pipe to be rolled off in rapid succession. Then this activity would stop and time would be given the crew in the

pipe barge to put these pipes in place. Vibration of the drilling barge could be expected and had occurred during the work. This vibration could cause pipe to roll, although this had not been observed on the pipe rack prior to the accident. No one could state from personal observation what caused the pipe to roll off the rack.

■ In view of the failure of the jury, in answer to Special Issue No. 3, to find the vessel not reasonably suited for its intended use because of the absence of chocks in place, the power of this court to review the finding must be considered at the outset. If the probative facts will support with reason a verdict in favor of appellant or a verdict in favor of appellee, the decision was exclusively for the jury to make. Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 77 S.Ct. 443, 1 L. Ed.2d 493 (1957).

"The very essence of the [jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable." Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 (1944).

However, in Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), the Supreme Court said:

"A finding of seaworthiness is usually a finding of fact. [citations] Ordinarily we do not, in admiralty, more than in other cases, review the concurrent findings of fact of two courts below. [citations] Here, however, both courts below, holding themselves bound by The Pinar Del Rio, supra [Plamals v. The Pinar Del Rio, 277 U.S. 151, 48 S.Ct. 457, 72 L.Ed. 827], have, on the facts found, held as a matter of law that the staging was seaworthy despite its defect. *That conclusion of law is reviewable here.* (emphasis added)

"* * *

"The staging from which petitioner fell was an appliance appurtenant to the ship. It was unseaworthy in the sense

that it was inadequate for the purpose for which it was ordinarily used, because of the defective rope with which it was rigged. Its inadequacy rendered it unseaworthy, whether the mate's failure to observe the defect was negligent or unavoidable. * * *

"Nor does the fact that there was sound rope on board, which might have been used to rig a safe staging, afford an excuse to the owner for the failure to provide a safe one. We have often had occasion to emphasize the conditions of the seaman's employment [citations], which have been deemed to make him a ward of the admiralty and to place large responsibility for his safety on the owner. * * * These conditions, which have generated the exacting requirement that the vessel or owner must provide the seaman with seaworthy appliances with which to do his work, likewise require that *safe* appliances be furnished *when* and *where* the work is to be done." (emphasis added)

In a number of cases the Circuit Courts of Appeal of the United States have held that on the facts found, or on the undisputed facts, unseaworthiness existed as a matter of law, either overturning findings to the contrary by the trial court or jury, or directing the trial court to ascertain damages and enter judgment in cases where the issue of seaworthiness had not been determined in the trial court. Grillea v. United States, 232 F.2d 919 (2nd Cir. 1956); Deffes v. Federal Barge Lines, Inc., 361 F.2d 422 (5th Cir. 1966); Beeler v. Alaska Aggregate Corporation, 336 F.2d 108 (9th Cir. 1964); Ferrante v. Swedish American Lines, 331 F.2d 571 (3rd Cir. 1964); Vega v. The Malula, 291 F.2d 415 (5th Cir. 1960); Van Carpals v. The S. S. American Harvester, 297 F.2d 9 (2nd Cir. 1961); Marshall v. Ove Skou Rederi A/S, 378 F.2d 193 (5th Cir. 1967); Walker v. Harris, 335 F.2d 185 (5th Cir. 1964), cert. denied 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed. 342 (1964); Mills v. Mitsubishi Shipping Company, 358 F.2d 609 (5th Cir. 1966);

Gibbs v. Kiesel, 382 F.2d 917 (5th Cir. 1967).

■ Appellant's point number three involves the position that the vessel is unseaworthy as a matter of law since it is undisputed that the pipe rack was being used both for storage and as an appliance in the process of unloading pipe; that there were no chocks or other mechanical means of preventing pipe from rolling off of the rack onto the men working on the pipe barge below; and that the pipe rolled off and injured appellant during ordinary intended use. Further, the point encompasses the position that if the vessel is unseaworthy as a matter of law, the answer made by the jury cannot be supported by any evidence of probative force. In determining this question, maritime law as interpreted by courts of the United States must be applied.

In Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed. 2d 413 (1959), the Supreme Court considered a case where the jury had found a vessel unseaworthy and the judgment of the trial court based on the verdict was reversed by the Court of Appeals. In the course of its opinion reversing the Court of Appeals, the Supreme Court said:

"This protection against unseaworthiness imposes a duty which the owner of the vessel cannot delegate. [citation] Unseaworthiness extends not only to the vessel but to the crew, [citation] and to appliances that are appurtenant to the ship. [citation] And as to appliances the duty of the shipowner does not end with supplying them; he must keep them in order. [citation] The shipowner is not relieved of this responsibility by turning control of the loading or unloading of the ship over to a stevedoring company. It was held in Grillea v. United States, 2 Cir., 232 F.2d 919, that stevedores themselves could render a ship *pro tanto* unseaworthy and make the vessel owner liable for injuries to one of them."

In Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L. Ed.2d 297 (1963), the Supreme Court said:

"Seaworthiness is not limited, of course, to fitness for travel on the high seas; it includes fitness for loading and unloading. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. It has already been held that when cargo is stowed unsafely in the hold a longshoreman injured thereby may recover for unseaworthiness. [citation]. * * *

"These cases all reveal a proper application of the seaworthiness doctrine, which is in essence that things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used."

In Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, the Supreme Court reversed and remanded for trial a case in which recovery had been denied a seaman who had alleged that a ship's rail which was habitually used as a means of egress to the deck was rendered unseaworthy by the presence of slime and gurry. If present on the rail at all, the slime came from cargo unloaded by the crew a short time prior to the accident. In the course of the opinion it was stated that in Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798,

"* * * the Court affirmed a judgment holding the shipowner liable for injuries caused by defective equipment temporarily brought on board by an independent contractor over which the owner had no control. That decision is thus specific authority for the proposition that the shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability. That decision also effectively disposes of the suggestion that liability for a temporary unseaworthy condition is different

from the liability that attaches when the condition is permanent.

"* * * What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence. * * *"

Morales v. City of Galveston, Texas, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962), was a case where the Supreme Court affirmed a judgment for the defendant. There a longshoreman suffered injuries from inhaling noxious fumes while loading grain in the hold of a ship not equipped with forced ventilation. In so doing, however, the Court stated:

"A vessel's unseaworthiness might arise from any number of individualized circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The method of loading her cargo, or the manner of its stowage, might be improper. [citations] For any or all of these reasons, or others, a vessel might not be reasonably fit for her intended service. What caused injury in the present case, however, was not the ship, its appurtenances, or its crew, but the isolated and completely unforeseeable introduction of a noxious agent from without."

The most recent case that has come to our attention decided by the Supreme Court of the United States is Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967). This was a suit by a seaman to recover from the shipowner the damage which he sustained while attempting to haul heavy manila mooring line along the deck of the vessel during the docking operation. He alleged that the assignment by the third mate of two men to do the work of three or four constituted negligence and made the vessel unseaworthy. The Court said:

"The basic issue here is whether there is any justification, consistent with the broad remedial purposes of the doctrine of unseaworthiness, for drawing a dis-

tinction between the ship's equipment, on the one hand, and its personnel, on the other. As regards equipment, the classic case of unseaworthiness arises when the vessel is either insufficiently or defectively equipped. In Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, however, the Court made it clear that the availability of safe and sufficient gear on board does not prevent the actual use of defective gear from constituting unseaworthiness, for the test of seaworthiness is to be applied 'when and where the work is to be done.' Id., at 104, 64 S.Ct. at 459. And in Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413, we further clarified the extent of unseaworthiness liability by holding that, even though the equipment furnished for the particular task is itself safe and sufficient, its misuse by the crew renders the vessel unseaworthy. We emphatically stated the basis of our holding: 'Unseaworthiness extends not only to the vessel but to the crew.' Id., at 427, 79 S.Ct. at 447. For that proposition the Court cited Boudoin v. Lykes Bros. S. S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354, where we said, 'We see no reason to draw a line between the ship and the gear on the one hand and the ship's personnel on the other.' Id., at 339, 75 S. Ct. at 385.

"We likewise see no reason to draw that line here. That being so, under *Mahnich* it makes no difference that respondent's vessel was fully manned or that there was a sufficient complement of seamen engaged in the overall docking operation, for there were too few men assigned 'when and where' the job of uncoiling the rope was to be done. And under *Crumady* it makes no difference that the third mate and two men he assigned to perform the job were themselves competent seamen, or that the rope was itself a sound piece of gear. By assigning too few men to uncoil and carry the heavy rope, the mate caused both the men and the rope to be misused.

"This analysis, we believe, is required by a clear recognition of the needs of the seaman for protection from dangerous conditions beyond his control and the role of the unseaworthiness doctrine which, by shifting the risk to the shipowner, provides that protection. If petitioner had been ordered to use a defective pulley in lifting the rope, he would clearly be protected by the doctrine of unseaworthiness. If the pulley itself were sound but petitioner had been ordered to load too much rope on it, he would likewise be protected. If four men had been assigned to uncoil the rope but two of the men lacked the strength of ordinary efficient seamen, petitioner would again be protected. Should this protection be denied merely because the shipowner, instead of supplying petitioner with unsafe gear, insufficient gear, or incompetent manual assistance, assigned him insufficient manual assistance? We think not. When this Court extended the shipowner's liability for unseaworthiness to longshoremen performing seamen's work, Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099—either on board or on the pier, Gutierrez v. Waterman S. S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297, either with the ship's gear or the stevedore's gear, Alaska S. S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L. Ed. 798, either as employees of an independent stevedore or as employees of a shipowner pro hac vice, Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L. Ed.2d 448—we noted that 'the hazards of marine service, the helplessness of the men to ward off the perils of unseaworthiness, the harshness of forcing them to shoulder their losses alone, and the broad range of the "humanitarian policy" of the doctrine of seaworthiness,' id., at 413, 83 S.Ct. at 1352, should prevent the shipowner from delegating, shifting, or escaping his duty by using the men or gear of others to perform the ship's work. By the same token, the shipowner should not be able to escape liability

merely because he has used men rather than machines or physical equipment to perform that work."

These cases establish these rules of law: (1) the shipowner is liable to longshoremen performing seamen's work for injuries resulting in whole or in part from unseaworthiness of the vessel; (2) unseaworthiness arises when the vessel is either insufficiently or defectively equipped; (3). an appliance is not reasonably fit for the purpose for which it is to be used unless it is safe when used for such purpose; (4) the misuse of safe and sufficient equipment renders the vessel unseaworthy; (5) the test of seaworthiness is to be applied at the time and place the work is to be done; (6) the availability of safe and sufficient gear on board does not prevent the use of defective or unsafe gear from constituting unseaworthiness; (7) a vessel may be made unseaworthy if an improper method of stowing cargo, or of unloading cargo, is used; (8) the vessel is liable for temporary unseaworthiness even though created by the employees of an independent contractor without the knowledge, actual or constructive, of the shipowners; and (9) liability for unseaworthiness is completely divorced from concepts of negligence unless the injury was caused by "the isolated and completely unforeseeable introduction of a noxious agent from without the ship."

In Marshall v. Ove Skou Rederi A/S, 378 F.2d 193 (5th Cir. 1967), the Court of Appeals found unseaworthiness as a matter of law, and, citing many cases, said: "The courts are, in the end, attempting to determine whether the seaman may perform his task aboard the ship with reasonable safety."

The opinion continued:

"Articulating criteria to determine seaworthiness requires use of the language of negligence. In the language of Walker v. Harris, supra [335 F.2d 185 (5th Cir. 1964), cert. denied 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed. 342 (1964)], 'What is the [gear] to do? What are the hazards, the perils, the forces likely to be incurred,' or, in the language of Mills [Mills v. Mitsubishi Shipping Company, 358 F.2d 609 (5th Cir. 1966)] what are the 'anticipated operating conditions'. The force and hazard to be incurred— single, obvious and great—by this cargo sling was the simple one of the force of gravity (or an external force, blow or mishandling) which, unless guarded against by operating proficiency, would cause the tilted beam to slip from the sling and fall and hurt someone. The force was not guarded against by shipowner's gear, and libelant was injured.

"* * *

"Under the undisputed facts, the cargo sling failed to perform the purpose for which intended, while being used in a proper manner and for exactly the purpose intended, and affected only by forces and hazards known to the libelee and against which the sling did not protect, and these conditions seriously affected the safety of libelant's place to work—then the sling was not seaworthy."

In Walker v. Harris, 335 F.2d 185 (5th Cir. 1964), the Court said:

"This analysis brings us, therefore, to the application of the familiar doctrine, so often invoked where vessels sink in calm waters, that sinking (or other failure) under circumstances and conditions which the vessel must reasonably anticipate and overcome is the best proof of, and makes out the classic case of, unseaworthiness. * * * Once it is assumed (or judicially held) that the vessel must anticipate the particular hazard and be staunch enough to override it, the only escape from the inference of unseaworthiness is proof that some new, unforeseen, intervening force or factor brought about the failure of ship or gear."

In Mills v. Mitsubishi Shipping Company, 358 F.2d 609 (5th Cir. 1966), the Court

of Appeals disregarded a finding of seaworthiness and held the vessel to be unseaworthy as a matter of law. The Court said that the uncontradicted testimony showed failure from an identifiable cause of ship's gear during normal expected operations. "But the result is the same even if, for want of adequate connecting evidence, the key is disregarded as the causative factor. In either case, the winch while under normal, expected use, with no proof that it was either being mishandled, abused or operated improperly, failed to perform the function for which it existed."

In Gibbs v. Kiesel, 382 F.2d 917 (5th Cir. 1967), a case where a seaman was injured when the wooden doors of a shrimp net fell on him, the Court said that "the primary issue on this appeal is whether the vessel was unseaworthy as a matter of law." The opinion stated: "Likewise, we believe, it is of no real significance how or why the 'doors' fell. The fact that they fell during ordinary intended use indicates a defective condition; therefore rendering the CEE DOT unseaworthy as a matter of law."

In Beeler v. Alaska Aggregate Corporation, 336 F.2d 108 (9th Cir. 1964), a decree was entered dismissing the libel, but the Court of Appeals held that where a ladder, brought on board a vessel by the longshoremen, slipped and caused injury to a longshoreman descending it because his fellow workers did not hold the ladder in accordance with custom and practice, the ship was unseaworthy. The Court said:

"Liability on the ground of unseaworthiness does not attach if the injury was sustained by the negligent use of a seaworthy appliance at the very moment of injury. It does attach if the negligent act has terminated and an appliance has been left in an unsafe condition.

"* * * Their negligence consisted in failing to act prior to the accident by stepping forward to hold or watch the ladder. Instead, they walked away. Their negligence had come to rest before

the ladder fell and was thus an antecedent condition causing the ladder to become unseaworthy."

In Ferrante v. Swedish American Lines, 331 F.2d 571 (3rd Cir.), the stevedore's negligent method of assembling piles of plywood boards side by side to make a slingload was held to make the ship unseaworthy, though the ropes used were adequate. The Court said:

"The Supreme Court has not yet spoken on the precise question as to whether a stevedore's negligence in the use of ship's seaworthy equipment makes the ship unseaworthy but doctrinal trends evidenced in its decisions since Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), indicate that it would answer the question in the affirmative.

"* * *

"In the instant case the District Court found negligent the stevedore's method of assembling two piles of plywood boards 'side by side' to make a sling load. Whether the operation is regarded as 'stowage' of the piles of boards as part of the discharge process, or the construction of a 'draft', or the mere use of the ship's equipment—the manila ropes—the fact remains that the stevedore 'failed to perform safely, a basis for liability including negligent and nonnegligent conduct alike', and that made the ship unseaworthy."

In Grillea v. United States, 232 F.2d 919 (2d Cir. 1956) [cited with apparent approval by the Supreme Court in Crumady v. The Joachim Hendrik Fisser, supra], the Court of Appeals held a vessel unseaworthy as a matter of law because longshoreman had been injured as the result of the failure to properly replace a hatch cover. The Court said:

"In the case at bar although the libellant and his companion, Di Donna, had been those who laid the wrong hatch cover over the 'pad-eye' only a short

time before he fell, we think that enough time had elapsed to result in unseaworthiness. * * * It may appear strange that a longshoreman, who has the status of a seaman, should be allowed to recover because of unfitness of the ship arising from his own conduct in whole or in part. However, there is in this nothing inconsistent with the nature of the liability because it is imposed regardless of fault; to the prescribed extent the owner is an insurer, though he may have no means of learning of, or correcting, the defect."

The Court of Appeals for the 4th Circuit held a ship unseaworthy as a matter of law, disregarding a jury finding that the ship was seaworthy, in Ballwanz v. Isthmian Lines, Inc., 319 F.2d 457 (1963). In this case a longshoreman was injured when a "spreader" fell from a sling used in hoisting crates into the hold of a ship. There was no real conflict as to how the injury occurred. The wire from which the sling was made was too stiff to hold the "spreader" securely. The opinion states:

"Finally in the factual aspects of this case, it was error to charge the jury that in considering the seaworthiness of the gear they might take into consideration the plaintiff's failure to complain or demand additional materials to make it better suited to the purpose for which it was being used."

The Court also said:

"The plaintiff was one of a gang of eight longshoremen working in the hold of the defendant ship. He had no responsibility for, or authority over, any of his fellow workers. His duty was to do his work as he was instructed. He was in no sense obligated to protest against the method of operation which he had been instructed to follow or to devise a safer method, nor was he obligated to call for additional or different equipment. If the doctrine of seaworthiness means anything, it is totally repugnant to the doctrine of assumption of risk on the part of seamen."

The testimony is uncontroverted that there were no chocks on the pipe racks at the time of the accident. The availability of chocks somewhere else on the vessel, or at some other time, is immaterial. The casing crew had no duty to search for chocks. The failure to furnish chocks at the time and place they were needed rendered the appliance not reasonably suited for its intended use, if, as a result, the use of the appliance was not reasonably safe. Had chocks been available at the time and place needed, nevertheless the failure to use the chocks rendered the vessel unseaworthy, if this failure created a dangerous condition. The injury was not sustained by the negligent use of a seaworthy appliance at the very moment of injury. By leaving the joint of pipe on the pipe rack unattended, no chocks being in place, the James Casing Crew created a condition which, if not reasonably safe, caused the vessel to become unseaworthy. The vital issue, therefore, is whether at this time the pipe rack was reasonably safe for the temporary storage of pipe, in other words, reasonably suited for its intended use.

Applying the tests of Walker v. Harris, supra, and Mills v. Mitsubishi, supra, we conclude that the hazards to be incurred by the pipe rack while being used for the storage of pipe were the "force of gravity" or "an external force, blow or mishandling." These hazards were not "guarded against by the shipowner's gear." The failure of the pipe rack to perform its intended function under normal operating conditions rendered the ship unseaworthy as a matter of law.

There is no evidence to sustain the jury's failure to find the pipe rack not reasonably suited for its intended use. The jury's answer to this issue should have been disregarded by the trial court. The judgment of the Trial Court is reversed and judgment is here rendered that Jerry Benton recover from Wheless Drilling Company the sum of $67,095.32 together with interest and costs of suit.

Reversed and rendered.